IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

W. LISA LOCKARD,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )    No.  08 C 3767
                                    )
FIDELITY INFORMATION SERVICES,      )
INC.,                               )
                                    )
            Defendant.              )

MEMORANDUM OPINION AND ORDER

W. Lisa Lockard ("Lockard") has brought a Complaint charging her former employer Fidelity Information Services, Inc. ("Fidelity") with two violations of Title VII of the Civil Rights Act of 1964 ("Title VII," 42 U.S.C. §§2000e to 2000e-17) and 42 U.S.C. §1981 ("Section 1981"): (1) employment discrimination on the basis of race and (2) retaliation.  Both charges are premised on Fidelity's having terminated Lockard's employment.

Fidelity has now moved for summary judgment under Fed. R. Civ. P. ("Rule") 56.  As part of her response to that motion, Lockard has filed a Motion To Strike Certain Exhibits Offered in Support of Defendant's Statement of Material Facts ("L. Mo.").  For the reasons stated in this memorandum opinion and order, both Fidelity's Rule 56 motion and Lockard's Motion To Strike are denied.[1]

_____

[1] Little time and space will be devoted to the Motion To Strike because such motions seldom do much to aid the analysis (discrete instances of inadmissability, such as hearsay statements that cannot be considered without running afoul of

## Summary Judgment Standard

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F. 3d 467, 471 (7th Cir. 2002)). But a nonmovant must produce more than "a mere scintilla of evidence to support the position that a genuine issue of material fact exists" (<u>Wheeler v. Lawson</u>, 539 F.3d 629, 634 (7th Cir. 2008)). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). What follows is a summary of the facts, viewed of course in the light most favorable to nonmovant Lockard.[2]

---

Rule 56(e)(1), are a possible exception). Instead the evidence tendered by the parties will be evaluated in terms of the standards next set out in the text, with submissions that fail to meet those standards simply not being credited, rather than being "stricken."

[2] Local Rule ("LR") 56.1 requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which are agreed upon. This opinion cites to Fidelity's LR 56.1 statement as "F. St. ¶--," to Lockard's counterstatement as "L. St. ¶--" and to the parties' respective responses as "F. Resp. St. ¶--" and "L. Resp. St. ¶--." Where a party does not dispute the adversary's original statement, this opinion cites only that original statement.

Fidelity is a corporation that provides and supports software products for financial institutions and other entities (F. St. ¶2). Harris Bank ("Harris") is the main client of Fidelity's Chicago office (F. St. ¶3). Lockard, who is African-American, was employed at Fidelity from 1986 to 2006. In 1999 she was transferred to Chicago and assigned to work with Harris (F. St. ¶¶4-5).

Joyce Lopez ("Lopez") was a Fidelity Account Manager II (F. St. ¶7) and became Lockard's supervisor upon the retirement of her previous supervisor Glenn Mitchell ("Mitchell") in April 2005 (F. St. ¶14). Chris Rhea ("Rhea") was Fidelity's Senior Account Manager responsible for the Harris account and was Lopez's supervisor (F. St. ¶6). Bettye Bennett ("Bennett") was Director of Human Resources at Fidelity, and Bridgette White ("White") was a Human Resource Generalist (F. St. ¶¶8-9).

Lockard was a Programming Manager II whose duties included managing a team of employees that supported software applications for Harris. At the time of her termination in 2006, Lockard's main duty was supporting the Information Warehouse applications (L. St. ¶7). Due to Information Warehouse's reporting requirements, Lockard frequently worked late hours (typically

---

[3] Although parties have deluged this Court with a factual spate, this opinion summarizes only those that are actually or potentially relevant.

until 6:30 or 7 p.m., and on occasion until 1 or 2 a.m.), so that Mitchell allowed her to start work later (L. St. ¶¶11-12). Lopez did not fully understand the applications that Lockard supported (L. St. ¶13).

Mitchell had considered Lockard a "good solid manager," "reliable" and "very knowledgeable," and he knew of no issue that would warrant a Performance Improvement Plan (L. St. ¶2).[4] Mitchell received no negative feedback about Lockard from any of her subordinates, or from Bennett (who interacted with him), or from his predecessor as Lockard's prior supervisor, who had begun Lockard's promotional process (L. St. ¶3). In October 2005 Lockard's Information Warehouse team received the "Team of the Month" award, given in recognition of performance beyond the call of duty and above normal expectations, with the team leader (here Lockard) given credit for leading or directing the team's efforts (L. St. ¶¶14, 15).

From the client's perspective, although Harris requested that some Fidelity employees be removed from its account, it never requested Lockard's removal (L. St. ¶¶16, 17). Harris employee Thomas Erickson, who worked closely with Lockard, had no concerns about Lockard's communication skills and made no

---

[4] Mitchell considered Lockard to be a B or B+ performer on an A to F scale, and he was one of two managers who caused Lockard's promotion from Program Manager I to Program Manager II (L. St. ¶¶2-3).

4

complaints about her (L. St. ¶¶4-5).

In October 2005, during a reduction in force, Lopez considered terminating Lockard, but she did not do so after Bennett told Lopez that Fidelity could face liability (Lockard was one of only a few African-American females in management) (L. St. ¶34).[5] Then a few months later (about March 30 2006[6]) Lopez completed Lockard's performance evaluation for 2005, giving her a "Does Not Meet Expectations" rating (F. St. ¶43). Lopez discussed the evaluation with Rhea, Bennett and White, and Rhea reviewed the evaluation (F. St. ¶¶40-41).

According to Lopez the rating was based on, among other things, feedback about Lockard that she received from Harris and Fidelity personnel,[7] missed due dates (including untimely delivery of a file to an outside vendor) and Lockard's failure to conduct a training session (F. St. ¶¶39, 48). That feedback assertedly expressed some concerns about timeliness in completing

---

[5] Ironically, October 2005 was the selfsame month in which Lockard's team received the "Team of the Month" award.

[6] All dates mentioned after this point fall in 2006 unless otherwise noted. Hence the omission of a year designation after any date means the event occurred in 2006.

[7] Lopez's testimony about negative feedback that she assertedly received from other sources is not considered here for the truth of the statements attributed to those other sources (which would be inadmissible on hearsay grounds)--instead it is admissible as to the fact of such receipt, part of the claimed input when Lopez evaluated Lockard's performance (see Luckie v. Ameritech Corp., 389 F.3d 708, 716 (7th Cir. 2004)).

assignments, providing information and responding to emails, tardiness, failure to attend meetings, and communication issues (F. St. ¶¶26-29, 31-34, 37-38).[8] But as against that, Mitchell had received positive feedback about Lockard from some of the same individuals whom Lopez identifies as providing negative feedback (L. St. ¶¶3, 5; L. Resp. St. ¶¶26, 29).[9]

Lockard had never received a rating below "Meets Expectations" from any prior supervisor (L. St. ¶1). She appealed Lopez's rating to Rhea (F. St. ¶45). Though she acknowledged to Rhea that she often arrived late, she not only explained the reason referred to earlier in this section but also gave him a written rebuttal to examples of performance concerns that Lopez had identified (F. St. ¶¶43, 47-49, 50-51). On April 24 Rhea informed Lockard that he would not change the

---

[8] L. Resp. St. ¶¶37-38 and L. Mo. 2-3 object on foundation grounds to F. St. Exs. 8-12 (which Fidelity offers in support of F. St. ¶¶37-38 and other factual statements) because Lopez did not identify the exhibits--a set of e-mails--in her deposition or elsewhere. Fidelity's Reply is accompanied by Lopez's affidavit authenticating the e-mails--an adequate response because Lockard's objection does not seriously challenge the exhibits' authenticity. Similarly, L. Mo. 4 objects to F. St. Ex. 13--a set of e-mails that, Fidelity asserts, Rhea consulted in evaluating Lockard. Fidelity's Reply attaches an affidavit from Rhea that provides sufficient foundation.

[9] F. Resp. St. ¶¶3 and 5 object that Mitchell's testimony about positive feedback is hearsay. Not so--as with the asserted feedback testified to by Lopez (see n.7), it is admissible for the fact of Mitchell's receipt. Notably, in that respect it could be viewed by a jury as impeaching not only Lopez's testimony but also the content she ascribed to those individuals (as prior inconsistent statements).

rating (F. St. ¶53). According to Rhea, his decision was based

on both personal observations and feedback that he had received

from others about Lockard's communication style, timeliness and

support of her subordinates (F. St. ¶¶22-23, 52-53; L. Resp. St.

¶¶22).[10]

According to Bennett, a manager who takes over supervision

of an employee at mid-year should obtain input from the prior

manager when completing an evaluation (L. St. ¶18), but Lopez did

not communicate with Mitchell. It is true that Mitchell knows of

no instance when a manager consulted a previous manager who had

retired (L. St. ¶18), but the fact of a "Does Not Meet

Expectations" rating and its consequences (described in the next

paragraph) are sufficiently serious that an unbiased supervisor

---

[10] One item on which Rhea relied was a document he received
from Harris listing Fidelity employees with a letter grade by
each name and showing a grade of "D" for Lockard (F. St. ¶¶18-
20). L. Resp. St. ¶20 and L. Mo. 2 argue that the document is
hearsay, emphasizing that Rhea does not know who prepared it or
how employees were graded. But again the fact of Rhea's receipt
of the document is not hearsay because it is part of the input
toward Rhea's disinclination to change Lopez's rating (Luckie,
389 F.3d at 716). More importantly in terms of the inference-
drawing process, no input towards the "D" rating had been sought
from Thomas Erickson, the Harris employee who had the most
contact, who was well satisfied with Lockard's work and
communication skills and who never had occasion to complain about
her to anyone (L. St. ¶¶5, 6). All of that said, it must also be
remembered that Rhea did not come on board until December 2005,
so that his nonaction had to be based on what he gleaned from
others--and those others importantly did not include (in addition
to the absence of input from Erickson) Mitchell's far more
positive view of Lockard, because Lopez had failed to inquire as
to his evaluation (which was based on far more extended contact
than Lopez's).

having a very short period of supervisory contact could reasonably be expected by a factfinding jury to avail herself of the much longer experience of her predecessor. Relatedly, Fidelity's Manager Handbook on Performance Evaluation states that evaluations should be conducted semi-annually, but Lopez had not conducted a mid-year evaluation of Lockard for 2005 (L. St. ¶24; F. Resp. St. ¶24).

Employees in Lockard's position who receive a "Does Not Meet Expectations" rating must receive a Performance Improvement Plan ("Plan")(L. St. ¶19). On April 27 or 28 Lopez gave Lockard a Plan that identified three areas of concern and set improvement goals for each area: (1) as to Attendance, reporting to work by 9 a.m. and providing notice before taking time off; (2) as to Performance, meeting all deadlines and responding to e-mails, voicemails and requests for information within 24 hours; (3) as to Communication, communicating with "tact and diplomacy" and maintaining professionalism (F. St. ¶¶56-57, 61). Rhea, Bennett and White read the Plan, with Rhea providing some feedback and Bennett providing editing(F. St. ¶59).

Lockard understood that receiving a Plan meant she could be terminated if her performance did not improve (F. St. ¶58). But Lockard believed the Plan was not finalized, and she asserts that the Plan did not comply with Fidelity policies (L. St. ¶36). To that end Lockard offers evidence of unwritten policies respecting

8

Plans (there is no evidence of written policies) (F. Resp. St. ¶19). That evidence comprises several aspects of Plan substance and procedure.

First, according to Bennett, Plans should be signed by both reviewer and employee to acknowledge issuance and receipt, but Lopez and Lockard did not sign the Plan at issue (L. St. ¶19). Second, according to Mitchell, Plans must include easily measurable goals rather than general goals (L. St. ¶19), and Lockard asserts that her specified goals were too vague. Third, according to Bennett Fidelity employees may have input into their Plan (L. St. ¶37). Lockard felt the Plan did not reflect the realities of her job duties--for example, it required a 9 a.m. starting time, but (as stated earlier) Lockard often worked late hours--sometimes extremely late hours--on Information Warehouse (L. St. ¶37). Fidelity did give Lockard a chance to provide written input, and she submitted a first draft of such input about May 18 and a final draft about June 29 (F. St. ¶62). Finally, according to Bennett, Fidelity recommends that managers meet at least monthly (and sometimes more frequently) with employees to monitor a Plan (Bennett Dep. 60-61). Lopez and Lockard discussed holding dedicated bi-weekly meetings for monitoring, but instead they talked about Lockard's progress at their standing weekly one-on-one meeting (L. St. 26).

Between late April and Lockard's July termination (described

later), Lopez documented Lockard's progress in Status Reports appended to Lockard's Plan (F. St. ¶¶63-64). During that period Rhea received updates on Lockard's progress from Lopez, and Lockard met with Rhea at least three times (L. St. ¶33; F. St. ¶66).

During the Plan monitoring period, Lockard arrived late to work and to her weekly meeting with Lopez on several occasions (F. St. ¶67). Around June 8 Lopez told Lockard that the Attendance area of the Plan had entered "red" status (F. St. ¶68). About June 6 Fidelity client representative Frank Jacques told Lockard and Lopez (via e-mail) that he did not like Lockard's tone in response to his question about an assignment (F. St. ¶69). On June 26 Lockard participated in an e-mail exchange with several other Fidelity employees, including Lockard's subordinate Brenda Smith ("Smith"), and with Harris employee Phil Hartl ("Hartl") (F. St. ¶70). Lopez read the e-mails Lockard authored as scolding Smith, which she found inappropriate because a Harris employee also received the e-mails (Lop. Dep. 91). Lopez forwarded the e-mail exchange to Rhea, but the e-mail she forwarded did not include a message from Hartl in which he stated that Lockard's position was correct--nor did Lopez talk to Hartl (L. St. ¶32).[11] In July Lopez informed

---

[11] It is unclear whether Lopez had received the Hartl message, for the record includes two versions of the e-mail exchange: Lopez Dep. Ex. 9 includes Hartl's message, while Lopez

Lockard that she viewed Lockard's communication style during a teleconference as inappropriate (F. St. ¶72). But one Status Report stated that Lockard "[met] expectations" in the Communication area for the month of May (although a Status Report dated July 13 later stated improvement "has not been sustained") (Lockard Dep. Ex. 2 at 3, 5). As of July Bennett thought Lockard's communication skills had improved (L. St. ¶39).

On July 13 Lockard was terminated during a meeting with White and Lopez (F. St. ¶77). Lockard was then the only African-American female manager in Fidelity's Chicago office (L. St. ¶23). Lopez was admittedly a major participant in the termination decision, while Rhea, Bennett and White all took part to some degree--all four had met on July 11 to discuss Lockard's progress toward her Plan goals (F. St. ¶¶73, 75; L. Resp. St. ¶75).

Because of the key part played by Lopez in the events leading to, and in the actual decision regarding, Lockard's firing, some elaboration on that score is important. In that respect L. Resp. St. ¶75 and L. Mem. 9-10 assert that Lopez alone made the ultimate decision to terminate Lockard, and L. St. ¶22

---

Dep. Ex. 14 does not, but it does include several messages not included in the other version. From the record it appears that Fidelity employee Marlene Bendt (one of the original recipients of the e-mail exchange) forwarded Ex. 14 to Lopez on July 10, and that Lopez forwarded it to Rhea on July 11, but there is no evidence of Lopez's receipt of Ex. 9.

offers evidence that at Fidelity the direct supervisor typically makes that decision. To be sure, L. St. ¶32 acknowledged that the June 26 e-mail exchange factored significantly in "Rhea's decision regarding [ ] termination," and Lockard opts not to dispute the F. St. ¶73 assertion as to the July 11 meeting. But although there is evidence of discriminatory animus only on the part of Lopez, there is no question that at a minimum she significantly influenced the decision to terminate, and there is equally no question that a jury could reasonably determine that her animus affected the outcome (see Long v. Teachers' Retirement Sys., 585 F.3d 344, 351 (7th Cir. 2009) and, even more recently, Kodish v. Oakbrook Terrace Fire Prot. Dist., 604 F.3d 490, 508 (7th Cir. 2010)). Even though Lockard acknowledges that Rhea came to his own decision as to termination, on the current record a jury could rationally view that decision as unduly triggered by Lopez's input rather than as an independent review (see id. at 352).

Because of the critical importance of the legal standard to be employed in evaluating, for summary judgment purposes, the facts already set out and to be set out hereafter, this opinion will take the admittedly unusual step of addressing those standards at this point rather than later. On that score some decisions by our Court of Appeals have imposed an unduly demanding test in situations in which an impermissibly biased

12

intermediate supervisor has provided a tainted input to an
ultimate decisionmaker who was innocent of any discriminatory
intent--a "cat's paw" approach that essentially requires that the
decisionmaker be deprived of free will, as though the bigoted
supervisor has figuratively guided the decisionmaker's hand in
signing the termination papers.  But other cases have applied
what this Court has always considered a more realistic approach,
under which those cases "have imputed the retaliatory intent[12] of
a subordinate to an employer where the subordinate exerts
significant influence over the employment decision" (Long, 585
F.3d at 351; and see the extended discussion there, id. at 351-
52)--a sort of "poisoning the decisional well" concept.

Most recently the tea leaves appear to support a reading
that conforms to what this Court has viewed as more realistic:
On April 19, 2010 the Supreme Court granted certiorari (129 S.
Ct. 2089) in Staub v. Proctor Hosp., 560 F.3d 687 (7th Cir.
2010), with the Solicitor General having filed an amicus brief
urging that our Court of Appeals' more stringent of the two
approaches (one requiring a "singular" rather than a
"significant" influence to be exercised by the biased supervisor)
was wrong and that an employer should be held liable "when a

---

[12] There is of course no difference in principle between
cases asserting illegal retaliation (where "retaliatory intent"
is at issue) and employment discrimination cases generally (where
"discriminatory intent" is the hallmark).

biased subordinate influences but does not make the adverse employment decision" (<u>Kodish</u>, 604 F.3d at 508 n. 13). <u>Kodish</u>, <u>id</u>. at 508 also reconfirmed the Seventh Circuit's mixed signals on the subject that had earlier been remarked in <u>Long</u>. What the Solicitor General and various of the Seventh Circuit cases treat as the correct standard was certainly satisfied by Lopez's role here.

That of course makes for a critical--indeed controlling--difference in the analytical approach to, and hence the outcome on, the current motion. It is obvious from what has gone before and what still remains of this factual presentation that Fidelity's counsel have primarily trained their analytical sights on its personnel higher in the food chain than Lopez, seeking to portray them as having reached an independent decision to fire Lockard and correspondingly downplaying Lopez's role. But all of that changes when the far more demanding showing by Lockard that Lopez played the "singular" role in the termination decision is rejected in favor of the need to show that Lopez's influence on that decision was at least "significant."[13]

Thus it becomes important to explore the record evidence as to Lopez's possible motivation. During her tenure as Lockard's

---

[13]  It should also not be forgotten, in the Rule 56 context, that there is evidence that a Fidelity intermediate supervisor in Lopez's position typically makes the termination decision as to one of her subordinates herself. If the jury were to credit that testimony, even the "singular role" standard would be met.

14

supervisor, Lopez made several comments to Lockard that could reasonably be considered as reflecting racially discriminatory animus, including a comment implying that Lockard spent her money on clothing and luxury items, a comment that Lockard "talked loud" and--far more pointedly than those statements, which cannot be treated as doing much damage to Fidelity's position--a comment expressing surprise that Lockard did not have a few children out of wedlock (L. St. ¶25).[14]  Lockard recalls that the comment about children out of wedlock was made at some point after late 2005 (L. St. ¶25), while the record does not state estimated dates for the other comments.

In late 2005 Lockard told Bennett that Lopez treated her in a racially discriminatory manner, and she said that she would go to the EEOC if Lopez's conduct continued (L. St. ¶¶25, 35). Lockard told Bennett about Lopez's comments, explained that she believed Lopez was trying to prevent Lockard's team from winning "Team of the Year" and stated that Lopez had a reputation as a racist (L. St. ¶35).[15]  Lockard later complained to Bennett about Lopez's negative evaluation, but she adduces no evidence that she

---

[14]  Though that statement may not be as offensive as a flat-out use of the "n" word, surely a jury could view it as both race-based and bigoted.

[15]  F. Resp. St. ¶35 argues that Lockard's account of Lopez's reputation is hearsay, but this Court will consider it as offered not for its truth, but rather to confirm that Lockard informed Bennett of arguably discriminatory conduct by Lopez.

15

also alleged discriminatory conduct at that time (L. St. ¶35).
Around April 2006 Lockard told Rhea that she believed Lopez was a
"closet bigot" and that she feared Lopez would not prepare a fair
Performance Improvement Plan (L. St. ¶¶25, 37; F. Resp. St. ¶25).

To shift from the focus of the factual matrix on Lockard
alone, Fidelity employees Patrick Hajduk ("Hajduk") and Cynthia
Schroeder ("Schroeder"), who are both white, also held the
Programming Manager II position and reported directly to Lopez
(L. St. ¶28).[16]  Hajduk was responsible for the loans team, and
Schroeder was responsible for the anti-money laundering team (L.
St. ¶¶28-29).

By way of contrast with Lopez's treatment of Lockard,
neither Hajduk nor Schroeder was placed on a Plan or terminated
(L. St. ¶¶28-29), even though problems with Hajduk's and
Schroeder's teams were discussed at meetings that Lockard
attended and even though Harris complained to Rhea about the loan
team's performance from late 2005 through the first half of 2006,
a period during at least part of which Hajduk was responsible for
the loans team (L. St. ¶28).[17]  Finally, Paula Theodore

_____

[16] Lockard has identified another employee, Pete Thompson,
who also held the same position and reported to Lopez (L. St.
¶¶29-30), but the cited portions of the record do not appear to
include evidence of performance problems involving Thompson or
his team.

[17] Fidelity offers Rhea's list grading Fidelity employees to
show Hajduk's performance was stronger than Lockard's (he
received a "B").  But the document is inadmissible hearsay for

("Theodore"), who is white, also reported to Lopez (L. St. ¶31).
Rhea administered a Plan for Theodore, but she was also not
terminated (L. St. ¶31).

Lockard's Claims

Race Discrimination Claim

Lockard charges Fidelity with race discrimination in
violation of Title VII and Section 1981.[18]  To defeat Fidelity's
motion for summary judgment, Lockard must establish[19] a genuine
issue of material fact as to whether intentional discrimination
motivated her termination.  Lockard seeks to proceed under both
(1) the direct approach, established by adducing direct or
circumstantial evidence of the employer's discriminatory intent
(Hasan v. Foley & Lardner LLP, 552 F.3d 520, 527 (7th Cir.
2008)), and (2) the indirect approach, which employs the burden-
shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S.
792 (1973).

---

that purpose because offered for its truth.

    [18] This opinion does not separately address Lockard's
Section 1981 claim because the same analysis applies to both
grounds for relief (see Cerutti v. BASF Corp., 349 F.3d 1055,
1060-61) (7th Cir. 2003)).

    [19] At the summary judgment stage, of course, Lockard need
not "show" or "establish" or "prove" anything, but must merely
demonstrate that a genuine issue of material fact exists.  This
opinion employees those terms only because the cited cases use
that terminology, but does not impose that burden on Lockard.

1. <u>Direct approach</u>

Under the direct approach Lockard may defeat summary judgment in either of two ways. One calls for the presentation of some "smoking gun" type proof of impermissible intent, while the other involves the more attenuated presentation of a "convincing mosaic of discrimination" out of circumstantial evidence (<u>Troupe v. May Dep't Stores Co.</u>, 20 F.3d 734, 737 (7th Cir. 2004)) such as "suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group" (<u>Hasan</u>, 552 F.3d at 527).

Lockard's arguments under the direct approach may be summarized this way: (1) Lopez's comments about Lockard reflect discriminatory animus, (2) irregularities in the evaluation and Plan suggest an ulterior motive and (3) Fidelity's assertion that Lockard's communication problems influenced her termination lacks credibility. Those last two components are essentially pretext arguments, as Lockard seeks to cast doubt on the honesty of Fidelity's professed reason for termination--Lockard's lack of progress toward her Plan goals. Because pretext may serve as circumstantial evidence of discriminatory intent (<u>Millbrook v. IBP, Inc.</u>, 280 F.3d 1169, 1175 (7th Cir. 2002)), this opinion will assess whether Lockard creates an inference supporting the notion of pretext, even while also considering whether the individual pieces of evidence proffered by Lockard contribute to

18

a mosaic of discrimination.

That determination may include a look at Lopez's comments and "how recent the comments were, how extreme, and who made the remarks" (Paz v. Wauconda Healthcare & Rehab. Ctr., LLC, 464 F.3d 659, 666 (7th Cir. 2006)). Certainly the fact that Lopez--Lockard's supervisor and a more than significant participant in the termination decision--made the remarks enhances the probative value of the comments. Although the proximity of those comments to the adverse employment action can also be relevant to their probative value, there is no clear rule on what degree of proximity is required (compare, e.g., the time frames involved (1) in Ptasznik v. St. Joseph Hosp., 464 F.3d 691, 693, 695 (7th Cir. 2006), where a comment made three months before termination did not establish discriminatory animus, and (2) in Hasan, 552 F.3d at 527, where comments made a year before termination were found highly probative under the circumstances).

Here Lopez's gratuitous comment about children out of wedlock pre-dated Lockard's termination by some indeterminate period of several months (it occurred at some point after late 2005), and the record does not provide dates for the other comments.[20] But the significance of temporal proximity of statements that reflect racial bigotry must not be overstated.

---

[20] As Lockard cannot fix the comments' timing, their specific proximity to her termination cannot be assumed (see Ptasznik, 464 F.3d at 695).

Surely Lopez's snide expression of surprise in her children-out-of-wedlock comment could appropriately be viewed by a jury as the kind of pejorative stereotypical statement that evidences an impermissible race-based mindset--and one that could just as appropriately be considered as persisting during the next several months.

This opinion will first go on to address Lockard's pretext arguments in those terms.  To show pretext Lockard must demonstrate "(1) it is more likely that a discriminatory reason motivated [Fidelity] than the proffered non-discriminatory reason or (2) that [Fidelity's] reason is not credible" (Hudson v. Chicago Transit Auth., 375 F.3d 552, 561 (7th Cir. 2004)).

First, Lockard suggests that Lopez, having been unable to terminate Lockard through the October 2005 reduction in force, devised a plan to bring about that termination (L. Mem. 7).  Lopez's idea was assertedly to give Lockard a negative rating to trigger a mandatory Plan, thereby laying the groundwork for termination.

In support, Lockard points to irregularities in the evaluation and Plan.  In that regard, an employer's divergence from its own policies may be circumstantial evidence of a discriminatory motive (Long, 585 F.3d at 352-53).  Indeed, the record includes evidence of several divergences from Fidelity

policy.[21]  For one thing, Lopez did not give Lockard a mid-year

evaluation or ask Lockard's previous supervisor (Mitchell) for

input on the 2005 evaluation.  For another, Lopez and Lockard did

not sign the Plan.  And more significantly, Lockard points out

that her Plan goals, especially her Communication goal, were

overly vague even though an unwritten Fidelity policy requires

that goals be specific and clear (recall Mitchell's statement,

mentioned earlier, to that effect).

But all of the precedents where an employer's divergence

from policy was held to support a finding of pretext have

involved significant noncompliance, such as failure to comply

with a policy requiring warnings before terminating employees for

trivial offenses (<u>Pryor v. Seyfarth, Shaw, Fairweather &</u>

<u>Geraldson</u>, 212 F.3d 976, 980 (7th Cir. 2000)).[22]  By contrast,

---

[21] Lockard also emphasizes that the Plan did not incorporate
her input and that Lopez failed to meet with her for Plan
monitoring on a biweekly basis.  But Fidelity's policies on
employee input and Plan monitoring meetings are discretionary
(see <u>Long</u>, 585 F.3d at 352-353), and it is also undisputed that
Lockard had an opportunity to provide input.  Lockard further
argues that the evaluation was irregular because it gave
insufficient weight to her positive achievements, such as the
Team of the Month award (L. Mem. 5).  But there is no evidence of
a corresponding Fidelity policy, and this Court cannot serve as a
"super personnel" department (see, e.g., <u>Ptasznik</u>, 464 F.3d 691,
697) that reviews an employer's balancing of strengths and
weaknesses in an employee evaluation.

[22] Other cases in which an employer's divergence from policy
supported an adverse finding include <u>Lewis v. Sch. Dist. #70</u>, 523
F.3d 730, 744 & n. 9 (7th Cir. 2008), where a superintendent made
a demotion decision independently, although policy required the
full School Board to participate, and <u>Giacoletto v. Amax Zinc.</u>

21

the absence of signatures on the Plan is comparatively insignificant in scope and therefore has weaker probative value as to pretext (especially given the professed reason for that policy: merely to acknowledge the Plan's issuance and receipt). But Lopez's failures to provide a mid-year evaluation and to seek Mitchell's input are more similar in scope to the examples drawn from precedent. Considering those divergences from Fidelity policy in conjunction with Lopez's comments about Lockard, a jury could reasonably conclude that Lopez had an ulterior motive in giving Lockard a negative evaluation. And that is enough to establish a material issue of fact when it comes to pretext.

Lockard's second theory of pretext attempts to undermine the credibility of Fidelity's assertion that Lockard's lack of progress toward her Communication goal justified termination (L. Mem. 10-11). In that regard Lockard argues in part that Lopez misrepresented an incident involving Lockard's participation in the June 26 e-mail exchange (it will be remembered that Fidelity contends that Lockard's perceived scolding of Smith in that e-mail exchange influenced her termination). Lockard argues that Lopez intentionally withheld a message where Hartl said that Lockard's position was correct. As already noted, the record does not establish that Lopez ever received Hartl's message. To

_____

Co., 954 F.2d 424, 427 (7th Cir. 1992), where an employer failed, although required by policy, to counsel an employee about performance issues and develop a plan for improvement.

assume that she did would require a speculative leap, and to conclude that she purposely withheld it would require a second leap. This Court will not take those steps.

Although there is more plausibility in Lockard's argument based on evidence of her improvement in the Communication area, there is nothing inherently dishonest in an employer's determination that recent problems in that area (such as the e-mail exchange) outweigh recent improvements. And although (as already stated) there is force to Lockard's complaint that the Communication goal was overly vague and that it did not specifically disavow her criticism of another employee, again there is nothing inherently dishonest about Fidelity's position that such criticism was at odds with the Communication goals to communicate with "tact and diplomacy" and maintain professionalism. On the whole, then, Lockard's second theory of pretext is less convincing than her first theory.

But one theory, if established, is enough. And as already stated and restated here, Lopez's disturbing and highly revealing pejorative statement about her surprise that Lockard did not have a few children out of wedlock constitutes strong circumstantial evidence of Lopez's discriminatory animus. And that is then reinforced, in terms of a material issue of fact as to pretext, by the evidence that Lopez diverged from Fidelity's policies on evaluations in more than one respect. Although Lockard has thus

succeeded in terms of the direct approach, for the sake of
thoroughness this opinion will also analyze her arguments under
the indirect approach.

    2. Indirect approach

    To prevail under the McDonnell Douglas approach, Lockard
must establish a prima facie case of discrimination by showing
that (1) she is a member of a protected class; (2) she met
Fidelity's legitimate expectations; (3) she suffered a materially
adverse employment action and (4) Fidelity treated similarly
situated employees outside the protected class more favorably
(Atanus v. Perry, 520 F.3d 662, 672-73 (7th Cir. 2008)).[23]  If
Lockard succeeds, the burden of production (though not of
persuasion) shifts to Fidelity, which must proffer a
nondiscriminatory reason for its action, at which point Lockard
must adduce sufficient evidence for a reasonable jury to conclude
that Fidelity's asserted justification is mere pretext (McDonnell
Douglas, 411 U.S. at 802, 804).  Although Fidelity concedes the

_____

        [23] Similarly, to establish retaliation under the indirect
approach, Lockard must first establish a prima facie case by
showing that she (1) engaged in a statutorily protected activity;
(2) suffered a materially adverse action, (3) was performing her
job satisfactorily and (4) was treated less favorably than a
similarly situated employee who did not engage in the protected
activity (Stephens v. Erickson, 569 F.3d 779, 786-87 (7th Cir.
2009)).  This opinion does not separately discuss Lockard's
retaliation claim, because the analysis of her discrimination
claim touches on almost precisely the same points and because the
ensuing textual discussion as to the next steps in the McDonnell
Douglas quadrille is equally applicable to a retaliation claim.

first and third elements of the prima facie case, it argues that
Lockard fails to establish pretext. But as shown earlier,
Lockard has established an issue of fact as to that element of
her claims.

To revert to one required component of each prima facie
case, Fidelity argues that Lockard cannot show she was meeting
Fidelity's legitimate expectations. In response Lockard
emphasizes her performance history (including previous
satisfactory reviews, the Team of the Month award and Mitchell's
positive opinion), but that evidence may be faulted because it
does not go to the time of termination (<u>Burks v. Wis. Dep't of
Transp.</u>, 464 F.3d 744, 753 (7th Cir. 2006)). However, the
evidence of her improved performance in the Communication area--
Lockard met expectations for May, and Bennett saw improvement by
the time of termination--plus what a jury might reasonably read
as the lack of justification and support for imposing the other
Plan goals suffice to raise a factual issue.

But Fidelity asserts that Lockard cannot identify a
similarly situated employee. Lockard offers as comparators
Patrick Hajduk and Paula Theodore, who are white and were not
terminated. Though a comparator need not be a "doppelganger," he
or she "must still be similar enough to eliminate confounding
variables, such as differing roles, performance histories, or
decision-making personnel" (<u>Filar v. Bd. of Educ.</u>, 526 F. 3d

1054, 1061 (7th Cir. 2008) (internal quotation marks omitted)).

As for Theodore, she reported to Lopez and was placed on a Performance Improvement Plan (by Rhea). But the record does not offer evidence about her position, her job duties or her performance failings, so it is not possible to assess whether she is "similar enough."

And as for Hajduk and Schroeder, both of them--like Lockard--held the Programming Manager II position, reported to Lopez and led a team that interacted with Harris. As already stated, problems with Schroeder's and Hajduk's teams were discussed at meetings that Lockard attended, and Harris complained about the loans team when Hajduk was leader of that team. But although there is evidence of performance concerns involving Schroeder's and Hajduk's respective teams, it is not enough to determine whether these concerns were comparable to Lockard's alleged performance difficulties in type or degree.

Thus in terms of the three other employees as potential comparators Lockard cannot meet that element of the prima facie case. But the assortment of facts that the litigants have assembled here, with all reasonable inferences drawn--as they must be--in Lockard's favor,[24] gives rise to an unusual (though

_____

[24] Although the earlier factual recital has faithfully included many aspects advanced by Fidelity, it must always be kept in mind that for Rule 56 purposes those that are at odds with Lockard's version of events must not be credited. Any resolution of the parties' competing presentations must be

not necessarily unique) scenario in which the most appropriate
comparator to Lockard is--Lockard herself.  What has been said
earlier about her pre-Lopez performance, and about Fidelity's
recognition of its quality during supervisor Mitchell's tenure,
needs no repetition.  And once again the reasonable inferences in
her favor reflect no meaningful decline in her performance that
could objectively justify--or could even subjectively justify,
absent an impermissible bias--her termination.

    In sum, to paraphrase the jury instructions that our Court
of Appeals has prescribed for employment discrimination cases
(beginning with Gehring v. Case Corp., 43 F.3d 340, 344 (7th Cir.
1994) and that are embodied in the Seventh Circuit Committee on
Federal Civil Jury Instructions 3.01 (general employment
discrimination instructions) and 3.02 (retaliation instructions),
it is clear that (1) Mitchell was replaced by Lopez as Lockard's
supervisor, but (2)(once again in Lockard's version, as required
to be benefited by all reasonable favorable inferences[25])

_____

reserved for the ultimate factfinder, not made by the court at
the summary judgment stage.

    [25] If this repeated iteration of that principle seems a bit
much, it is not done for dramatic effect, as was the case with
Cyrano's poetic repetition of "Then, as I end the refrain, thrust
home!" in his Act 1 duel with the Vicomte de Valvert in Rostand's
play Cyrano de Bergerac.  Instead, such repetition here is
occasioned by the fact that the caselaw too frequently gives the
principle lip service, but does not really honor it, by granting
summary judgment--the disposition of such cases on paper--when a
trier of fact might weigh the evidence, including live testimony
evaluated in terms of witness credibility, and reasonably come

"everything else had been the same."  And that being the case,
the combination of a finding of Lopez's tainted intent plus her
key role in the adverse employment action of Lockard's firing
precludes the entry of summary judgment in Fidelity's favor.  To
focus on Lockard's retaliation claim, for example, it would be
within the province of a factfinder to resolve that issue in
Lockard's favor, just as was done and was then affirmed late last
month by our Court of Appeals in <u>Pickett v. Sheridan Health Care
Ctr.</u>, No. 09-3028, 2010 WL 2541186, at *7 (7th Cir. June 25).

Conclusion

For the reasons already stated at length, this Court denies
both Fidelity's Rule 56 motion and Lockard's Motion To Strike.
This action is set for a status hearing at 9 a.m. July 19, 2010
to discuss further steps to bring the case to trial.

_____
Milton I. Shadur
Senior United States District Judge

Date:  July 8, 2010

---

out the other way.